UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

_____

UNITED STATES OF AMERICA,

                                        Plaintiff,


            -v.-                                    5:03-CV-0765
                                                    (NPM /RFT)

ALCAN ALUMINUM CORPORATION,
and RUSSELL MAHLER,


                                        Defendants.

_____


APPEARANCES                         OF COUNSEL:


U.S. DEPARTMENT OF JUSTICE          DAVID L. GORDON, ESQ.
Attorney for Plaintiff
Environment & Natural Resources Division
P.O. Box 7611
Ben Franklin Station
Washington, DC 20044


U.S. DEPARTMENT OF JUSTICE          GEORGE A.B. PIERCE, ESQ.
Attorney for Plaintiff
Environment Enforcement Section
P.O. Box 7611
Ben Franklin Station
Washington, DC 20044


OFFICE OF U.S. ATTORNEY- ALBANY     JAMES C. WOODS, ESQ.
Attorney for Plaintiff
218 James T. Foley Courthouse
445 Broadway
Albany, NY 12207-2924

U.S. DEPARTMENT OF JUSTICE                MARK A. GALLAGHER, ESQ.
Attorney for Plaintiff
POB 7611
Washington, DC 20044-7611


NOVELIS CORPORATION                       JOHN C. TILLMAN, ESQ.
Attorney for Defendant,
Alcan Aluminum Corporation
P.O. Box 6977
6060 Parkland Boulevard
Cleveland, OH  44124-4185


NOVELIS CORPORATION                       MARK DOUGLAS KINDT,
                                          ESQ.
Attorney for Defendant,
Alcan Aluminum Corporation
P.O. Box 6977
6060 Parkland Boulevard
Cleveland, OH  44124-4185


NEAL P. McCURN, Senior District Court Judge


<u>MEMORANDUM-DECISION AND ORDER</u>


I.      **Introduction**

The United States of America ("Plaintiff") brings this action pursuant to the

Comprehensive Environmental Response, Compensation and Liability Act, as amended

("CERCLA"), 42 U.S.C. § 9601 *et seq*., seeking a recovery of response costs pursuant to

§ 107(a) of the Act.  Plaintiff seeks payment from defendants Alcan Aluminum

Corporation ("Alcan") and Russell Mahler ("Mahler") for reimbursement of costs

incurred by the United States with respect to the Quanta Resources Superfund Site ("Quanta") located at 2802-2810 Lodi Street in Syracuse, New York, together with accrued interest.  The Court has jurisdiction over this matter pursuant to 42 U.S.C. §§ 9607 and 9613(b), and 28 U.S.C. §§ 1331 and 1345.

Currently before the Court is Plaintiff's Motion for Summary Judgment against Alcan pursuant to Rule 56 of the Federal Rules of Civil Procedure ("Federal Rules"). Plaintiff has concurrently filed a Motion for Default Judgment pursuant to Rule 55(b)(2) of the Federal Rules against Mahler, which will be considered in due course.  For the reasons set forth below, Plaintiff's Motion for Summary Judgment will be granted in part and denied in part.

## II.   BACKGROUND

### A.   Factual Background

The following uncontested facts are taken from the parties' "Joint Stipulation Between United States and Alcan Aluminum Corp[oration]" (the Joint Stipulation, or "JS").  The JS, dated January 10, 2006, is set forth here in its entirety.[1]

_____1.   History of the Quanta Site

The Quanta Resources Superfund Site comprises 0.75 acres and is located at 2802-2810 Lodi Street in Syracuse, New York ("Lodi Street facility" or "Site").  Before the Environmental Protection Agency's ("EPA's") removal action, the Lodi Street Facility

---

[1]      The Court has adopted a narrative form, instead of the numbered format used by the parties to the JS, but the content is unaltered.

comprised three buildings, the "canning and boiling building" (later referred to as the "main building"), a smaller "refining building" and a small pump house, approximately 52 above-ground storage tanks ("ASTs") with capacities ranging from 225 to 20,000 gallons, three underground storage tanks ("USTs") with capacities ranging from 10,000 to 23,000 gallons, and two sumps, including an oil/water separator.  Approximately 23 of the ASTs were outdoor tanks.

The Site is located in a zoned industrial area with a large shopping center and a residential neighborhood nearby.  The nearest residential area is approximately 1000 feet east of the Site.  Onondaga Lake is less than one half mile from the Site.  The Site is presently bordered by a gas station and a storage location for junked cars.

Seitz Oil Company began operations at the Site in the 1920s.  Seitz Oil Company's operations comprised the collection of waste oils and the processing of those oils into lubricating oils and motor oils.  The Seitz family sold Seitz Oil Company to the Defendant Russell Mahler in 1957.  In the 1960s Seitz Oil Company also commenced the processing of waste oils for use as fuel.  From 1972 to 1979, various companies owned and controlled by Mahler, including Anchor Oil Corp., Northeast Oil Services, Newtown Refining, Hudson Refining Corp., and Polar Industries (hereafter referred to individually and collectively as the "Mahler Companies") conducted operations at the Lodi Street facility.  In the 1970s Mahler also began operating waste oil processing facilities on Review Avenue in Long Island City, New York and in Edgewater, New Jersey.

-4-

2.    Alcan, Its Oswego Plant and the Hot Rolling Mill

_____Alcan Aluminum Corporation was a Texas corporation with its corporate

headquarters and principal place of business in Mayfield Heights, Ohio ("Alcan-Texas").

Alcan-Texas was the successor-in-interest to Alcan Aluminum Corporation, an Ohio

corporation ("Alcan-Ohio').  In January 2005, Alcan changed its name to Novelis

Corporation ("Novelis").  [Alcan-Texas, Alcan-Ohio and Novelis are hereafter

individually and collectively referred to as "Alcan."]  Alcan is a "person" within the

meaning of Sections 101(21) and 107(a) of CERCLA, 42 U.S.C. §§ 9601(21) and

9607(a).

Alcan has owned and operated a plant in Oswego, New York since 1963, at which

it manufactured sheet and plate products.  Alcan operated two rolling mills at the Oswego

plant, the 120-inch mill and the 100-inch mill, to process aluminum ingots into sheets of

aluminum.[2]  As part of the manufacturing process, Alcan used an oil and water

emulsion to lubricate and cool the aluminum ingots and the steel rollers of the two rolling

mills.  The emulsion consisted of a mixture of approximately 95 percent deionized water

and approximately five percent mineral oil.  As the emulsion was circulated through the

two rolling mills, bacteria would grow in it.  Bacteria levels in the emulsion were

monitored on a daily basis and were controlled to maintain oil droplet particle size

distribution and the lubricating properties of the emulsion within a narrow range of

---

[2]     For a comprehensive explanation of Alcan's hot rolling process, see United States
v. Alcan Aluminum Corporation, 97 F. Supp 2d 248, 255 (N.D.N.Y. 2000).

lubricity required for the rolling process.

When the lubricating properties required for the rolling process could not be maintained, the used emulsion was pumped into waste oil storage tanks for later disposal. Alcan had two tanks for storing used emulsion, an indoor tank of about 20,000 or 25,000 gallons, and an outdoor tank of about 40,000 gallons.

The mineral oil used in the emulsion was made by Farbest and contained proprietary additives.  Based on analytical results collected by EPA in 1987, the used emulsion ultra filtrate contained napthalene and 2-methylnapthalene at estimated (*i.e.*, below practical qualification limits of the test protocol) concentrations of 22 parts per billion ("PPB") and 8 PPB, respectively.  There was no change in the emulsion used at the Oswego facility from the 1970s until 1987.  The emulsion picked up fragments of the aluminum ingots during the rolling process.  The used emulsion contained aluminum as well as trace amount of the impurities in the ingot, including cadmium, chromium, copper, lead and zinc.  From September 1978 to September 1979, Alcan operated a pilot ultra-filtration unit which filtered approximately 1,000 gallons of used emulsion per day.  Beginning in September 1979, Alcan filtered all of the used emulsion before disposal.[3]

3.     Operations at the Lodi Street Facility Generally

_____

[3]     "The ultra filtration unit processes the emulsion so that less material is sent out for disposal and more is recycled in house.  In the ultra filtration process, the emulsion is circulated through a membrane system, yielding two by-products: 'the ultra filtration concentrate which is subsequently used as a fuel and a permeate which then flows to an on-site lagoon for further treatment.'"  Treated permeate is then discharged into Lake Ontario.  U.S. v. Alcan Aluminum Corporation, 97 F. Supp 2d  at 256 (internal quotations omitted).

The Mahler Companies picked up motor oils, industrial wastes containing oil, and emulsified oil/water mixtures from businesses including vehicle maintenance and repair facilities, oil terminals and factories, and brought these wastes to the Lodi Street facility. The Mahler Companies processed these wastes to produce oil used for fuel.  Until 1975, wastes arriving at the Lodi Street facility were initially placed in Tank 20 (as shown on the Weston map; [shown as] tank 18 on the Wehran map)[4] or one of the USTs.  After 1975, wastes arriving at the Lodi Street facility were initially placed in the 23,000 gallon "dump" or "drop" tank (tank 32 on Weston map; tank 17 on Wehran map).  In general, wastes were then moved into storage tanks or "feedstock" tanks before being processed.

Wastes to be processed into fuel, including some oil/water wastes, were heated in the 20,000 gallon "cooking" tanks (tanks seven through ten on the Weston map) which caused the oil to separate from the water.  Sometimes wastes were moved directly from the dump tank into the cooking tank, or directly from the tanker truck into the cooking tank.  After processing, the recovered oil was placed in storage tanks such as tanks one through six on the Weston map.  The recovered oil was then sold for use as a fuel.

In 1975, the Mahler [C]ompanies installed an "oil/water separator" at the Lodi Street facility, and thereafter all wastes being disposed of into the sewer system first passed through the oil/water separator.  The purpose of the oil/water separator was to trap loose oil in the water and prevent the loose oil from going into the sewer system.

─────────────────────

[4]       The Weston and Wehran maps (I.D. Nos. EPA00038422 and EPA00043960, respectively) are attached as an addendum to this decision.

Commencing in approximately June 1979, the Lodi Street facility greatly decreased its disposals into the sewer system. Instead, wastes otherwise destined for the sewer were sent to other sites, such as the "Borehole" at the Butler Tunnel Superfund Site in Pittston, Pennsylvania,[5] the Long Island City facility and the Edgewater facility.[6]

In the course of processing the waste oils, sludges accumulated in all of the tanks. All the tanks had to be cleaned out periodically. The tanks were cleaned out when enough sludge accumulated to cover the heating coils and/or the openings to the pipes which fed liquids to or drained liquids from the tanks. The heating coils were about 3 ½ feet above the floor of the tanks. The tank cleaning process involved removing the accumulated sludges from the tanks with shovels or vacuum trucks. The sludges were disposed of at the local dump or were sent to the Long Island City, NY or Edgewater, NJ facilities. Mahler sold the Lodi Street, Edgewater and Long Island City facilities to Ag-Met Oil Service, Inc. in approximately early 1978.

While Ag-Met owned the Lodi Street facility, Mahler worked for Ag-Met and continued to control operations at the facility. The fuel oil processing operation at the Lodi Street facility did not change when Ag-Met took over ownership of the Lodi Street facility. Mahler repurchased the Lodi Street, Edgewater and Long Island City facilities from Ag-Met in approximately January 1979. The process for making fuel oil did not

---

[5]      See, e.g., U.S. v. Alcan Aluminum Corp, et al., 964 F.2d 252 (3d Cir. 1992) ("Alcan/Butler").

[6]      See, e.g., U.S. v. Exxon Corporation, 766 F. Supp. 177 (S.D.N.Y. 1991).

change when Mahler bought the Lodi Street facility back from Ag-Met.  The Mahler Companies ceased to process wastes at the Lodi Street facility in approximately July 1979.

Mahler sold the Lodi Street, Edgewater and Long Island City facilities to Quanta Resources Corp. ("Quanta") in approximately mid-1980.  Quanta did not process waste oils at the Lodi Street facility.  Quanta operated the Lodi Street facility primarily as a waste oil transfer facility and much of the waste oil brought there was transported to Quanta's facilities in Edgewater, NJ or Long Island City, NY.

    4.    <u>Processing of Alcan's Used [E]mulsion</u>

Mahler Company and Ag-Met records indicate that during the period from August 1971 to December 1979, Alcan contracted with the Mahler Companies and Ag-Met to remove and transport approximately 4.2 million gallons of used emulsion from the Oswego Plant.  The Mahler Companies often picked up Alcan's used emulsion in tanker trucks that had capacities of 6,500 or 7,000 gallons.  During 1978 and 1979, some volumes of Alcan's used emulsion that were transported by Mahler Companies and Ag-Met were disposed of at other sites, including the "Borehole" at the Butler Tunnel Superfund Site in Pittston, Pennsylvania, the five New York City landfills, the Edgewater, NJ facility and the Long Island City facility.

    4.    <u>Removal Action at the Site</u>

Quanta ceased all operations at the Lodi Street facility in November 1980.  When

it abandoned the Lodi Street facility, Quanta left behind quantities of wastes in the tanks and sumps.  In August 1989, NYSDEC[7] requested EPA's assistance in addressing the environmental threats posed by the Site.  EPA performed an assessment of the conditions at the Site in October 1989.  Altogether, there were 29,000 gallons of liquid waste and 290 drums of sludges and solids in the ASTs, sumps and drums at the Site, and there were 43,745 gallons of liquid waste and 160 tons of sludges and solids in the USTs at the Site. The following hazardous substances, among others, were found in the tanks, sumps, drums and soils at the Site: napthalene, 2-methylnapthalene, cadmium, chromium, copper, lead, nickel and zinc.

EPA determined that the conditions at the Site presented an unacceptable risk to the health of the population in the area and to the environment, and authorized the performance of a removal action at the property in two phases ("Removal Action"). Phase 1 of the Removal Action was performed in May 1990 and included: (a) sampling of all ASTs, USTs, sumps, drums and insulation on tanks and boilers; (b) securing and sampling a tank suspected of being under pressure at the Site; and (c) securing all open tanks; (d) cleanup of a spill area along Lodi Street; and (e) collecting, sampling and securing of all drums.  Phase II of the Removal Action was completed in 1992 and included: (a) cleaning and decommissioning of all ASTs; (b) removal and disposal of 42,500 gallons of hazardous wastes from the ASTs, drums and sumps; (c) dismantling of

---

[7]        New York State Department of Environmental Conservation

the ASTs and piping and recycling of approximately 185 tons of scrap steel; (d)

pretreatment and discharge to the publicly-owned treatment works ("POTW") of 14,000

gallons of waste water generated from the decontamination of the ASTs; and (e) removal

and disposal of asbestos insulation from two tanks, one in the main building and one in

the refining building.  As part of the Removal Action, EPA planned to remove and

dispose of the contents of the USTs, to excavate the USTs and to dispose of the resulting

scrap metal. However, this work was not completed in 1992.

In July 1997, EPA verbally authorized a supplemental cleanup action to address

the threat of fire at the Site and the threat to public health posed by the contents of three

containers of hazardous substances at the Site.  This supplemental cleanup work included:

(a) removal and disposal of three containers of hazardous substances; (b) resecuring of

the perimeter fence at the Site; (c) resecuring of the oil/water separator; and (d) removal

and disposal of the contents of the oil/water separator.

In September 1999, EPA authorized performance of the work that still remained to

be completed under the Removal Action, *i.e.*, the cleanup of the USTs.  The UST

cleanup, completed in 1999, included: (a) removal and disposal of the contents of the

USTs; (b) removal and disposal of asbestos insulation from boilers in the main building

and refining building; (c) removal of the boilers in the main building and refining

building; (d) demolition of the buildings; and (e) excavation of the USTs and removal of

contaminated soil near the USTs.  The main building and refining building each contained

boilers that were insulated with asbestos materials.  EPA's regulations require that when demolishing a building, all asbestos-containing material be removed and properly disposed of prior to the demolition.  EPA removed and properly disposed of the asbestos on the boilers in the two buildings prior to the demolition of the buildings.

After completing the UST cleanup, EPA performed site restoration work, including replacement of the security fence, and applying of grass seed, fertilizer and mulch, which was completed in the [sic] June 2000, and prepared a UST closure report which was completed in September 2000.  EPA's other activities at the Site included: (a) enforcement activities, including searches for potentially responsible parties ("PRPs"); (b) On-Scene Coordinator ("OSC") visits to assess security at the Site; [and] (c) oversight of a soil investigation being performed at the Site by PRPs.

As of November 30, 2005, EPA's unreimbursed response costs regarding the Site, excluding interest, and including DOJ costs through September 30, 2005, are $1,935,611.68.  The total interest accrued on EPA's response costs regarding the Site from October 7, 1999 (the date EPA made a written demand to Alcan for reimbursement of its response costs) through December 31, 2005 is $277,592.12.  The United States' unreimbursed response costs regarding the Site, including DOJ costs through September 30, 2005, EPA direct and indirect costs through November 30, 2005, and accrued interest through December 31, 2005 are $2,213,203.80.

## B.    Procedural History

Plaintiff filed this recovery action against the defendants on June 19, 2003. (Dkt. No. 1.)  Alcan filed an answer to the complaint and filed a cross-claim against Mahler for negligence, breach of contract, and for other relief on September 22, 2003. (Dkt. No. 6.) Despite personal service of Plaintiff's summons on Mahler on August 22, 2003 (Dkt. No. 9, Ex. 3), Mahler did not file any responsive pleading or motion with the Court within the twenty calendar days allowed pursuant to Rule 12(a)(1) of the Federal Rules.  Plaintiff applied to this Court for entry of default against Mahler, and default was entered by the Court pursuant to Rule 55(a) of the Federal Rules on December 8, 2003. (Dkt. No. 9.)

On January 10, 2006, Alcan filed a motion in limine with this Court to exclude the expert report and testimony of Dr. Eugene Meyer. (Dkt. No. 25.)  Also on that date, Alcan filed a motion in limine to exclude the expert report and testimony of Attorney James J. Kohanek. (Dkt. No. 26.)

The Plaintiff filed a motion for a default judgment as to Mahler's liability under Section 107(a) of CERCLA on January 10, 2006 (Dkt. No. 27) concurrently with a motion for summary judgment against Alcan. (Dkt. No. 28, the "Motion.")  Alcan filed its response in opposition to the Motion on February 13, 2006. (Dkt. No. 33, the "Opposition.")  Plaintiff also filed its opposition to both motions in limine to exclude expert testimony on that date. (Dkt. Nos. 36, 37.)

_____On March 6, 2006, Alcan filed its reply to the Plaintiff's response to the motions in

limine (Dkt. Nos. 39, 40) and Plaintiff filed its response to Alcan's Opposition (Dkt. No. 41, the "Reply").  The Motion is now fully briefed and ripe for decision.

## III.   Discussion

### A.     Summary Judgment Standard

A motion for summary judgment shall be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c).  See also Celotex Corp. v. Catrett, 477 U.S. 317, 322, 106 S.Ct. 2548, 2552 (1986); Security Ins. Co. of Hartford v. Old Dominion Freight Line, Inc., 391 F.3d 77, 82 (2d Cir. 2004).  "[I]n assessing the record to determine whether there is a genuine issue as to a material fact, the court is required to resolve all ambiguities and draw all permissible factual inferences in favor of the party against whom summary judgment is sought[.]"  See Security Ins., 391 F.3d at 83, citing Anderson V. Liberty Lobby, Inc., 477 U.S. 242, 255, 106 S.Ct. 2505 (1986).  "Only when reasonable minds could not differ as to the import of the evidence is summary judgment proper."  Bryant v. Maffucci, 923 F.2d 979, 982 (2d Cir.), citing Anderson, 477 U.S. at 250-51.

While the initial burden of demonstrating the absence of a genuine issue of material fact falls upon the moving party, once that burden is met, the non-moving party must "set forth specific facts showing that there is a genuine issue for trial," see Koch v.

-14-

Town of Brattleboro, Vermont, 287 F.3d 162, 165 (2d Cir. 2002), citing Fed. R. Civ. P.

56(c), by a showing sufficient to establish the existence of every element essential to the

party's case, and on which that party will bear the burden of proof at trial, see Peck v.

Public Serv. Mut. Ins. Co., 326 F.3d 330, 337 (2d Cir. 2003), cert. denied, 124 S.Ct. 540

(2003).

**B.     CERCLA Liability Standard**

"In CERCLA[,] Congress enacted a broad remedial statute designed to enhance the

authority of the EPA to respond effectively and promptly to toxic pollutant spills that

threatened the environment and human health.  The EPA is authorized to commence

'response actions' to abate any actual or threatened releases of hazardous substances,

§ 9604(a)(1), and a federal Superfund exists to pay for mandated cleanups." B.F.

Goodrich Co. v. Murtha, 958 F.2d 1192, 1197 (2d Cir. 1992). Response actions under

CERCLA "include remedial efforts to prevent or minimize releases as well as attempts to

remove hazardous substances entirely. The Act also authorizes the EPA to recover its

costs from responsible parties as a means to replenish and maintain the Superfund." Id.

"CERCLA § 9607 is a strict liability statute ... The government is not required to

show that a specific defendant's waste caused the incurrence of cleanup costs in order for

strict liability to attach to that defendant." U.S. v. Alcan Aluminum Corporation

("Alcan/PAS II"), 315 F.3d 179, 184 (2d Cir. 2003).

1.      **Covered Persons**

In setting forth the parameters for liability under CERCLA, 42 U.S.C. § 9607(a)

enumerates the four categories of "covered persons" as follows:

> Notwithstanding any other provision or rule of law, and
> subject only to the defenses set forth in subsection (b) of this
> section--
>
> **(1)** the owner and operator of a vessel or a facility,
>
> **(2)** any person who at the time of disposal of any hazardous substance
> owned or operated any facility at which such hazardous substances were
> disposed of,
>
> **(3)** any person who by contract, agreement, or otherwise
> arranged for disposal or treatment, or arranged with a
> transporter for transport for disposal or treatment, of
> hazardous substances owned or possessed by such person, by
> any other party or entity, at any facility or incineration vessel
> owned or operated by another party or entity and containing
> such hazardous substances, and
>
> **(4)** any person who accepts or accepted any hazardous
> substances for transport to disposal or treatment facilities,
> incineration vessels or sites selected by such person, from
> which there is a release, or a threatened release which causes
> the incurrence of response costs, of a hazardous substance,
> shall be liable for--
>
> **(A)** all costs of removal or remedial action incurred by the
> United States Government or a State or an Indian tribe not
> inconsistent with the national contingency plan;
>
> **(B)** any other necessary costs of response incurred by any
> other person consistent with the national contingency plan;

**(C)** damages for injury to, destruction of, or loss of natural resources, including the reasonable costs of assessing such injury, destruction, or loss resulting from such a release; and

**(D)** the costs of any health assessment or health effects study carried out under Section 9401(I) of this title.

42 U.S.C. § 9607(a) (West 2006)._____

### 2.   Establishing a *Prima Facie* Case for Liability

To establish a *prima facie* case for liability against a PRP pursuant to CERCLA, the Plaintiff "must show that (1) the site is a "facility" as defined in CERCLA, (2) a release or threatened release of a hazardous substance has occurred, (3) the release or threatened release has caused the plaintiff to incur response costs that were necessary and consistent with the National Contingency Plan[8] set up by CERCLA, and (4) the defendants fall within one or more of the four classes of responsible persons described in CERCLA § 107(a)." Freeman v. Glaxo Wellcome, Inc., 189 F.3d 160, 163 (2d Cir. 1999)

### 3.   Defenses to CERCLA Liability

_____In addition, the only defenses to liability under CERCLA are as follows:

There shall be no liability under subsection (a) of this section for a person otherwise liable who can establish by a preponderance of the evidence that the release or threat of release of a hazardous substance and the damages resulting

---

[8]       "The National Contingency Plan specifies procedures for preparing and responding to contaminations and was promulgated by the Environmental Protection Agency (EPA) pursuant to CERCLA § 105, 42 U.S.C. § 9605  (2000 ed. and Supp. I).  The Plan is codified at 40 CFR pt. 300 (2004)." Cooper Industries, Inc. v. Availl Services, Inc., 543 U.S. 157, 161 n.2 (2004)

therefrom were caused solely by--

**(1)** an act of God;

**(2)** an act of war;

**(3)** an act or omission of a third party other than an employee or agent of the defendant, or than one whose act or omission occurs in connection with a contractual relationship, existing directly or indirectly, with the defendant (except where the sole contractual arrangement arises from a published tariff and acceptance for carriage by a common carrier by rail), if the defendant establishes by a preponderance of the evidence that (a) he exercised due care with respect to the hazardous substance concerned, taking into consideration the characteristics of such hazardous substance, in light of all relevant facts and circumstances, and (b) he took precautions against foreseeable acts or omissions of any such third party and the consequences that could foreseeably result from such acts or omissions; or

**(4)** any combination of the foregoing paragraphs.

42 U.S.C. § 9607(b) (West 2006).

### C.    Divisibility and Apportionment Standard

A determination of liability under CERCLA does not end the inquiry, or resolve the issue of liability completely.  "[O]nce the government has established the four essential elements of liability the burden shifts to the defendant to demonstrate, by a preponderance of the evidence, that there exists a reasonable basis for divisibility." U.S. v. Hercules, Inc., 247 F.3d 706, 717 (8th Cir. 2001).  "[C]ourts have added a 'common law gloss' to the statutory framework of CERCLA ... [Courts] 'have at once adopted a scheme of joint and several liability but at the same time have limited somewhat the availability of such liability against multiple defendants charged with adding hazardous

substances to a Superfund site.'" Alcan/PAS II, 315 F.3d at 184-85.

Citing the Restatement Second of Torts § 433A (1965),[9] the Second Circuit reiterated the standard for divisibility previously set forth in U.S. v. Alcan Aluminum Corporation ("Alcan/PAS"), 990 F.2d 711, 722 (2d Cir. 1993). "[I]n the event that Alcan did not qualify for the special exception,[10] we ruled that the company could nonetheless 'present evidence relevant to establishing divisibility of harm.' [The Second Circuit] identified several types of proof that would be relevant to such a showing of divisibility, including relative toxicity, migratory potential, and synergistic capacities of the hazardous substances at the site." Alcan-PAS II, 315 F.3d at 184-85. The court made clear that Alcan bears the ultimate burden of establishing a "reasonable basis for apportioning liability and that the government has no burden of proof with respect to what caused the release of the hazardous waste and triggered the response costs." The court emphasized that apportionment is an intensely factual determination and the burden to show

_____

[9]     "[W]here two or more causes have combined to bring about harm, damages from the harm are to be apportioned among the causes if there are distinct harms or there is a reasonable basis for determining the contribution of each cause to a single harm." Restatement (Second) of Torts § 433A(1) & cmt. 2 (internal quotations omitted).

[10]     Citing its previous decision in Alcan-PAS, 990 F.2d at 722, the Second Circuit stated that "Alcan may escape joint and several liability 'if it either succeeds in proving that its oil emulsion, when mixed with other hazardous wastes, did not contribute to the release and cleanup costs that followed, or contributed at most to only a divisible portion of the harm' ... [A]lthough we declared that it would be possible to avoid liability entirely, we specified that such would be a 'special exception' that would permit Alcan to escape payment only if the company could prove that its pollutants did not contribute more than background contamination and also cannot concentrate.'" Alcan-PAS II, 315 F.3d at 185.

divisibility is substantial.  Id.

**D.     Application of the Law to the Facts of this Case**

**1.     Liability**

Alcan has the unenviable distinction of being a party to litigation in many civil

actions in the Second and Third Circuits to determine, *inter alia*, liability under

CERCLA.[11]  Consequently, as the Second Circuit noted in its 2003 decision, "Alcan's

divisibility burden has grown heavier as this litigation has progressed." Alcan-PAS II,

315 F.3d at 185.  Indeed, there now exists a body of case law finding Alcan jointly and

severally liable for response costs at various other hazardous waste disposal sites.

However, the issue before the Court is Alcan's liability under CERCLA as a PRP at the

Quanta Resources Superfund Site.  The Court is presently tasked not to decide the merits

of the case, but to determine whether  reasonable minds could differ as to the import of

the evidence.  As set forth above, this Court is constrained to resolve all ambiguities and

draw all inferences in favor of Alcan.

As a threshold matter, this Court must look to whether the Plaintiff has established

---

[11]      See, *e.g.*, City of New York v. Exxon Corporation, 744 F.Supp. 474 (S.D.N.Y.
1990); U.S. v Alcan Aluminum Corp., 755 F. Supp. 531 (N.D.N.Y. 1991); City of New York v.
Exxon Corporation, 766 F. Supp. 177 (S.D.N.Y. 1991); U.S. v Alcan Aluminum Corp., 964 F.2d
252, (3d Cir.1992); Alcan/PAS, 990 F.2d 771 (2d Cir. 1993); U.S. v Alcan Aluminum Corp., 892
F. Supp. 648 (M.D.Pa. 1995); U.S. v Alcan Aluminum Corp., 96 F.3d 1434 (3d Cir. 1996); U.S.
v Alcan Aluminum Corp., 1996 WL 637559 (N.D.N.Y. 1996); U.S. v Alcan Aluminum Corp.,
97 F.Supp. 2d 248 (N.D.N.Y. 2000); U.S. v Alcan Aluminum Corp., 315 F.3d 179 (N.D.N.Y.
2003).

a *prima facie* case of CERCLA liability against Alcan.  The Court considers and bases its

finding on the stipulated facts set forth above and the complete record of the case.  First,

it is not disputed that the Lodi Street site is a "facility" as defined in CERCLA, and

second, a release of a hazardous substance has occurred.  Alcan states that for purposes of

Plaintiff's Motion, it does not dispute these issues. (Opposition at 6.)

Plaintiff alleges that the release at the facility caused the Plaintiff to incur response

costs that it claims were necessary and consistent with the National Contingency Plan

("NCP") set up by CERCLA; and Alcan falls within one or more of the four classes of

responsible persons described in CERCLA § 107(a), specifically as a "covered person"

pursuant to § 107(a) (3): "any person who by contract, agreement, or otherwise arranged

for disposal or treatment, or arranged with a transporter for transport for disposal or

treatment, of hazardous substances owned or possessed by such person, by any other party

or entity, at any facility or incineration vessel owned or operated by another party or

entity and containing such hazardous substances."

In the case at bar, Alcan is not disputing that the Plaintiff incurred response costs,

nor does it allege that such costs were inconsistent with the NCP.[12]  However, Alcan

disputes that it falls within one or more of the four classes of responsible persons

described in CERCLA § 107(a), and proffers that the inconsistent and contradictory

---

[12]     In its divisibility /apportionment argument, however, Alcan does dispute whether
some buildings were demolished within the scope of § 40 CFR 300.400(b)(2). (Opposition at
23.)

testimony of former Mahler employees raises genuine issues of material fact on whether any Alcan emulsion ever reached the Lodi Street facility.

The Plaintiff contends and the Court concurs that in fact, Alcan's position in previous litigation was that its emulsion was processed at the Lodi Street facility.  See, e.g., City of New York v. Exxon Corporation, 744 F. Supp. 474, 478 (S.D.N.Y. 1990) (Alcan submitted both a letter from Mahler and the affidavit of a former Mahler company plant superintendent in an attempt to prove, inter alia, that the emulsion was preprocessed and/or processed at the Lodi Street facility and not disposed of in City landfills). Consequently, Alcan's proffer that no Alcan emulsion ever reached the Lodi Street facility is controverted by its own statements to the contrary in previous litigation.  Alcan posits different theories as to what happened to a significant amount of the emulsion once it left the Alcan plant in Oswego,[13] but the case law is clear that the Plaintiff need only prove that some of the waste was brought to the facility.  Accordingly, the Court finds by a preponderance of the evidence that Alcan's waste, more likely than not, reached and was processed at the Lodi Street facility.

The Plaintiff has sufficiently represented to the Court that the remaining requirements to prove its prima facie case are met; i.e., in satisfaction of the third element, a release occurred that caused the Plaintiff to incur response costs, and fourth,

_____

[13]      Alcan suggests, inter alia, that the emulsion was either discarded directly down the Syracuse storm and sanitary sewer systems, or transported off-site. (Opposition at 15-16.)

pursuant to Section 107(a)(3), Alcan was a "person who by contract, agreement, or

otherwise arranged for disposal or treatment, or arranged with a transporter for transport

for disposal or treatment, of hazardous substances owned or possessed by such person ...,"

hence a "covered person" under that subsection.  Accordingly, the Court finds that,

pursuant to the strict liability standard under CERCLA, the Plaintiff has presented a

*prima facie* case for liability against Alcan.

## 2.    Divisibility

The Court now looks to the issue of divisibility of harm.  In Alcan-PAS II, the

Second Circuit stated that "[i]n order to avoid the imposition of joint and several liability

under CERCLA, the company must (1) demonstrate that the harm caused by its emulsion

was 'distinct' from the harm caused by other contributors [at the facility] or (2) proffer a

reasonable basis for determining the proportional contribution of its emulsion to what

may be conceived of as a single harm at each site." 315 F.3d at 186.  The court reiterated

the several types of relevant proof needed for establishing divisibility, including relevant

toxicity, migratory potential, degree of migration, and synergistic capacities of the

hazardous substances at the site. Id. at 185-86.  The Second Circuit expressed agreement

with the trial court that Alcan failed to demonstrate that the harm done at the subject

Superfund sites was divisible, *i.e.*, Alcan "did not satisfy its substantial burden with

respect to divisibility because it failed to address the totality of the impact of its waste at

each of the sites; it ignored the likelihood that the cumulative impact of its waste

emulsion exceeded the impact of the emulsion's constituents considered individually, and neglected to account for the emulsion's chemical and physical interaction with other hazardous substances already at the site." Id. at 187.

The fact pattern in the case at bar, however, is much different than that found in Alcan/PAS or Alcan/Butler. Unlike waste dumped and commingled in, for example, a million gallon lagoon (see Alcan/PAS) or dumped down a bore hole (see Alcan/Butler), the Lodi Street facility consisted of a large number of separate and distinct storage tanks, including three USTs, 52 ASTs and two sumps, which functioned, inter alia, as drop tanks, cooking tanks, and storage tanks. In addition, there were three buildings on the Site, the "canning and boiling building," a smaller "refining building" and a small pump house.

As stipulated above, from the 1920s to the mid-1960s, the Lodi Site was used to process waste oils into lubricating oils for resale. Alcan asserts that by the time it contracted with the Mahler companies to remove emulsions from the Oswego plant in the early 1970s, the Lodi Street facility had discontinued its lube oil business, and consequently, "the Alcan emulsion was not a feedstock to the historical lube oil process and associated building, equipment, ASTs and USTs. The lube oil processing and the fuel oil processing were conducted at different locations at the Lodi Site and used different tanks." (Alcan's Opposition at 19.) Alcan contends that consequently, the "harm or threat of harm from any wastes remaining within the lubricating oil ASTs is

-24-

distinct and divisible from the harm or threat of harm, if any, related to the Alcan emulsion because it is divisible chronologically, physically, and geographically." Id. Indeed, the Plaintiff concedes that because the USTs were not in close proximity to the facility's two smaller buildings which were demolished, Alcan may be able to demonstrate that the harm which led to the demolition of these two buildings is a distinct harm for which it is not liable. (Reply at 13.)  The Plaintiff also concedes, for summary judgment purposes only, that Alcan wastes were not put into tanks that may have been used in the lube oil operation. (Reply at 17.)

Alcan also contends that a reasonable basis for apportionment exists both by volume on a proportional basis, and by an analysis of the issues of relative toxicity, migratory potential, and synergy.  Alcan posits the theory that because the Alcan waste was not hazardous, not toxic, not explosive or ignitable, if the Alcan waste was commingled with other waste at the Site, it would serve to reduce the toxicity of the other waste.  In evaluating the synergistic and interactive quality of its waste, Alcan also proffers that because of the high water content in the Alcan waste, it would act as an antagonist in reducing the toxicity of commingled waste.  Finally, in its analysis of migratory potential, Alcan asserts that if its emulsion were present, it would serve to diminish the release of hazardous constituents into the environment as opposed to the acids and/or corrosives present in the Quanta wastes, which would be expected to potentiate, or enhance the migration of the metals present at the Site. (Opposition at 29.)

Alcan has persuaded the Court that these issues will be adequately addressed at trial. Pursuant to the standard for divisibility set forth in Alcan-PAS and Alcan-PAS II, the Court will not impose joint and several liability on Alcan and denies summary judgment to the Plaintiff on this issue, leaving the matter of divisibility for the trier of fact.

Accordingly, after a thorough consideration of the Motion and the Opposition with attendant exhibits, the Reply, and the wealth of prior litigation of which Alcan was a part, the Court finds as a matter of law that a reasonable basis exists for divisibility and apportionment of the environmental harm. The highly fact-specific determination of divisibility and actual apportionment of damages presents a genuine issue for trial. Divisibility and apportionment, if any, will be determined by a jury, pursuant to Alcan's jury demand.

## IV.    Conclusion

For the reasons set forth above, Plaintiff's Motion for Summary Judgment is granted in part and denied in part as follows: the Court hereby

(1) GRANTS Plaintiff United States' motion for summary judgment of the issue of CERCLA liability; and

(2) DENIES Plaintiff United States' motion for summary judgment on the issue of divisibility and apportionment.

(3) The Court will consider the pending motions in limine in due course, and upon

resolution of same, will set this matter down for trial.

     SO ORDERED.

April 26, 2006

 

_____
Neal P. McCurn
Senior  U.S. District Judge